**MILLER, Alien Property Custodian, v. MAYER et al. MAYER v. MILLER, Alien Property Custodian. REIS v. MILLER, Alien Property Custodian, et al.**

(Circuit Court of Appeals, First Circuit. September 18, 1924.)

Nos. 1730–1732.

1. **Partnership ⬛305—In determining interest of partner having assets in United States and foreign country, both must be measured in money at gold standard value.**

In determining the interest of an American partner in a firm having partners and assets in both the United States and Germany at the time of its dissolution by the declaration of war between the two countries, the American assets being valued in gold money or its equivalent, in valuation of the German assets in marks they must be taken at their par or gold value, regardless of their fluctuating exchange value.

2. **Partnership ⬛333—Premium paid for surety bond held chargeable against assets in liquidation.**

The cost of a surety bond given by the American partner in a firm having also German partners, in order to recover assets of the firm from the Alien Property Custodian for purposes of liquidation, and also the expense of the suit for such recovery, *held* chargeable against the assets so recovered on the accounting between the partners.

3. **Partnership ⬛333 — Taxes, etc., paid by American partners held not recoverable by German partners on dissolution by war.**

Where, on the dissolution by the declaration of war of a partnership having both American and German partners, the German partners appropriated the assets in that country as their own property, they are not entitled to recover from the American partner any part of taxes subsequently levied and paid thereon, nor sums afterward paid out on his authority, given before the dissolution, which was thereby terminated.

4. **Partnership ⬛333—Partner held not entitled to allowance of interest on liquidation.**

Where a firm having both German and American partners and assets was dissolved by the declaration of war, and the American assets were seized by the Alien Property Custodian, on final accounting, the American partner *held* not entitled to allowance of interest.

Appeals from the District Court of the United States for the District of Massachusetts; Charles F. Johnson, Judge.

Suit in equity by Thomas W. Miller, Alien Property Custodian, against Richard Mayer, Edwin Reis, and others. From the decree plaintiff, Mayer, and Reis and others separately appeal. Modified and affirmed. See, also, 278 Fed. 27.

Elias Field, Sp. Asst. Atty. Gen. (Dean Hill Stanley, Sp. Asst. Atty. Gen., on the brief), for Alien Property Custodian.

Edward F. McClennen, of Boston, Mass. (Dunbar, Nutter & McClennen and Guy Murchie, all of Boston, Mass., on the brief), for defendant Mayer.

Morris Buchter, of New York City (Clifford P. Warren, of Boston, Mass., on the brief), for defendants Reis and others.

Before BINGHAM and ANDERSON, Circuit Judges, and HALE, District Judge.

HALE, District Judge. In the year 1913 Richard Mayer, a naturalized citizen of the United States and a resident of Boston, formed a partnership under the name of Reis & Co., with Edwin Reis and Ludwig Reis, residents of Germany, and Karl B. Strauss, a naturalized citizen of Great Britain. The firm had a "regular firm office" in Boston, and established houses in Germany, England, and the United States. In 1914 and 1915 Mayer organized two Massachusetts corporations, the Richard Mayer Company and the Anglo-American Cotton Company, and capitalized them with assets of Reis & Co. in his hands. By June, 1915, the shares in the Richard Mayer Company were all in Mayer's name, except for a few nominal shareholders. The shares in the Anglo-American Cotton Company were in the name of the manager, one Laible, but were indorsed in blank, and were in Mayer's possession. By the outbreak of the war between Germany and the United States, April 6, 1917, the partnership was dissolved. The German partners thereafter continued the German business as a going business, and have so continued it on their own account, treating the German assets as their own. It appears that Mayer, after the outbreak of the war, converted into cash all the American assets, except the stock in the Richard Mayer Company and the stock in the Anglo-American Cotton Company, and

had the cash invested in his own name. In May, 1918, the Alien Property Custodian seized all the stock of the Richard Mayer Company and of the Anglo-American Cotton Company as the property of Reis & Co. In September, 1918, he seized the securities and cash. In November, 1918, Mayer filed a claim with the Alien Property Custodian for the return of the property alleging a dissolution of the partnership on the declaration of war, that he had taken all the property over as his own, and that he believed the German partners had no claim on him. In March, 1919, he filed another claim, restating his right to a return of the property. On April 7, 1919, he brought a bill in equity against the Custodian for the return of the property, basing his claim on the alleged dissolution agreement of February 7, 1917, and also on his right to the possession of the American assets to secure his lien and to account for the balance.

This suit, Mayer v. Garvan, Alien Property Custodian, et al., came before the District Court, and by appeal was brought to this court. This court held (278 Fed. 27) that the partnership was dissolved upon the outbreak of war, April 6, 1917; that the alleged dissolution agreement of February 7, 1917, was invalid; that, after the declaration of war, all commercial intercourse between the American and German partners was unlawful, and opposed to the public policy of the United States; that under the partnership articles the complainant is entitled upon distribution to have repaid him out of the assets of the partnership the amount of his capital investment, with interest, and also 20 per cent. of the net profits which had been earned by the partnership, and he is liable for 20 per cent. of all losses; "that, upon the present state of the evidence, this court is unable to state an account as between the parties, or Richard Mayer and the Alien Property Custodian, there being no evidence of the actual value of the American property or of the German or English property, and there being no evidence of the liabilities of the firm; * * * that the complainant on the dissolution of the partnership with the outbreak of war had a lien on the American assets and their proceeds for what was due him from the partnership on an accounting of the affairs of the partnership and was entitled to retain the American assets in his hands until the satisfaction of the amount due him on such accounting; that the plaintiff is entitled to the immediate repossession of all property so seized and the net proceeds arising therefrom; that the plaintiff shall hold possession of the money and property so delivered to him under the terms and provisions of section 8 (a) of the Trading with the Enemy Act, and of the rights and duties in respect thereof which are set forth in paragraph 10 of this decree."

In June, 1922, such property as remained in the hands of the Alien Property Custodian was returned to Mayer, who immediately accounted to the Alien Property Custodian, alleging that there was no surplus to be paid over to him. This account was not approved by the Custodian. The Alien Property Custodian then brought suit against Mayer and the German partners to determine their respective shares in the firm assets, joining all parties necessary to a settlement of the controversy. After a careful hearing, Judge Johnson in the District Court finds the value of Mayer's share of the net assets in Germany on April 6, 1917, to be M2,414,056.12, and that from this sum there should be deducted the sum of M266,432.40, the amount paid by the German partners after April 6, 1917, for taxes assessed on Mayer's partnership interest during the years 1914, 1915 and 1916; also that there should be deducted the sum of M50,400, paid by the German partners to Mayer's relatives in Germany, all of which, except M600 was paid after April 6, 1917. Deducting these amounts, there remains as Mayer's share of the European assets on April 6, 1917, M2,097,223.72; and the District Court holds that the German partners should account to him for that sum as of April 6, 1917. For the purposes of this accounting the District Court finds that the sum of $828,072.72 represents the value of the American assets for which Mayer should account, and that his share of these assets is 20 per cent. or $165,614.54, and that to this sum should be added his interest in the European assets which has been stated in marks.

With reference to the value of the mark, the District Court finds:

"Upon March 30, 1917, the nearest date to April 6, 1917, when the rate of exchange was quoted, the value of the German mark in the currency of the United States was about 18 cents. After the declaration of war there was, of course, no rate of exchange between the United States and Germany, and none was quoted until some time in 1919, when the first quotation of the value of the German mark in the currency of the United States was 7⅞ cents. Upon

July 2, 1921, when the state of war was declared to be at an end by the Act of Congress, the German mark had declined to 1.35 cents; and at the time of the beginning of the hearing before me, March 28, 1923, its value was .0048 of a cent, and it is well known that since that time the rate of exchange has further declined. There is no evidence to show the domestic value of the German mark, nor whether the decline in the rate of exchange, as shown in this country, correctly expresses the decline in its value in Germany."

The District Court finds also:

"The decree in this case must be in terms of American dollars. The American assets are measured in terms of the American gold dollar containing gold of a standard weight and fineness. The German assets should be measured by the same yard-stick; that is, by the gold mark which is equivalent to 23.82 cents of the money of the United States, both based upon a gold standard."

The assignments of error challenge substantially all the findings of the District Court. The learned counsel for the Alien Property Custodian and for the German partners urge, with earnestness and with great learning, that the title to the partnership property was not affected by the outbreak of the war, or by any act of the partners; that Mayer is chargeable with his ratable share of the depreciation in the value of European assets since dissolution; that the accounting to determine the distributive shares of the parties must be stated upon the basis of the present value of the partnership assets; and that the value of the mark should be at the present rate of exchange.

This is not a suit to dissolve a partnership or to obtain an accounting for operations of the partnership after April 6, 1917. It has already been determined that the partnership was dissolved at the above date by the terms of the Trading with the Enemy Act, and by the decree of May 4, 1922, that Mayer is entitled to hold all the assets until his share in the firm assets has been determined.

The law is well settled that, in the case of the death of a partner, it is the duty of the surviving partners to liquidate within a reasonable time. If they do not so liquidate, but continue the business of their own motion, they become liable for the value of the deceased's share at the time of dissolution. Clay v. Field, 138 U. S. 464, 473, 11 Sup. Ct. 419, 34 L. Ed. 1044; Moore v. Rawson, 185 Mass. 264, 70 N. E. 64;

Hutchins v. Page, 204 Mass. 284, 290, 90 N. E. 565, 134 Am. St. Rep. 656.

We have no doubt that the accounting in this case must be as of the date of dissolution and termination of the partnership, April 6, 1917, on and after which time the German partners conducted the business in Germany on their own account, treating the assets there located as their own.

[1] The most important question is whether the District Court was right in holding that the German assets should be measured by the gold standard by which the American assets are measured, namely, that they should be measured by the gold mark, equivalent to 23.82 cents of the money of the United States.

In Adams v. Cordis, 8 Pick. 260, 266, the Massachusetts court had before it a case in which a foreign creditor sued for his debt in Massachusetts, and it was held (Chief Justice Parker speaking for the court) that "all the plaintiffs can ask is their debt justly liquidated and paid in the lawful currency of the United States," and "that the debt is to be paid according to the par, and not the rate of exchange."

In Grant v. Healey, Fed. Cas. No. 5,696, 3 Summ. 523, Judge Story carefully considered Adams v. Cordis, and disagreed with some of the reasoning of Chief Justice Parker; but he held that the suit before him was brought for a balance of account, for advances made at Boston for goods consigned to the plaintiff at Trieste and sold by them at a loss, and that, inasmuch as the balance was not payable at Trieste, but was payable at Boston, therefore the balance was to be estimated in damages at par and not at the rate of exchange. In Reiser v. Parker, Fed. Cas. No. 11,685, 1 Lowell, 262, Judge John Lowell had before him an action to recover a certain number of pounds sterling, payable in London. Judge Lowell discussed fully the cases upon the subject, and held that "the only safe rule is to compare the pound and the dollar upon a gold basis." He said: "The pound sterling has always been treated as money here, though foreign money; as a standard of value, and not as a commodity. * * * Its value has a known and precise relation to that of our coin, so much so as to have become a question for the court rather than the jury; but it has none to our paper, because the latter is constantly fluctuating. We think it would be unsafe, and on the whole likely to work injustice, if this value were to be considered an open question in each case."

In Birge-Forbes Co. v. Heye, 251 U. S. 317, 325, 40 Sup. Ct. 160, 64 L. Ed. 286, and 248 Fed. 636, 640, 160 C. C. A. 536, the Circuit Court of Appeals for the Fifth Circuit and the Supreme Court had before them a case where a German had disbursed marks for his American principal; he sued in the District Court of the United States. It was held that the plaintiff company could recover in dollars at the normal value of the mark; that the German mark should be taken at par, in the absence of evidence that it had depreciated at the time of the plaintiff's payments. The decision was put upon the ground that the purpose of the judgment is to make the plaintiff whole for the amount which he paid out in discharging the obligations of his principal. In Page v. Levenson, 281 Fed. 555, 557, Judge Rose, in the District Court, comments upon the above case, and cites a long list of cases showing the wide divergence of opinion both in the English and in the American courts upon this subject.

In the case at bar the issue before us relates to the amount of surplus, if any, for which Mayer, on April 6, 1917, was accountable in America, in American dollars, to be paid to the Alien Property Custodian of the United States. We think the amount of credit which Mayer may deduct because of his interest in the German assets on April 6, 1917, when they were taken over by the German partners as their own, is to be determined by the value of those assets at that time measured in the same medium of dollars, or by the number of grains of gold, in the two standards, to make them one, and not by the fluctuations in the rate of exchange. The intrinsic value of the mark was the amount of gold contained in .2382 of an American dollar.

The learned counsel for the plaintiff and for the German defendants have brought before us no decisions which support the proposition that the amount of credit described in dollars to which Mayer was entitled on April 6, 1917, on account of the German assets, should be affected by the rate of commercial exchange at any date after April 6, 1917.

The courts have not been in full agreement upon this question; but we think that, upon the evidence brought before us in this suit, the reasoning and the better authority are in favor of the decision which the District Court has reached.

[2] After the decree of this court in Mayer v. Garvan, in order to obtain a performance of the decree by the Alien Property Custodian, Mayer was obliged to pay out $4,000 as premium on a surety bond conditioned on his performance of any decree to be entered in the case. Mayer insists that this premium should be allowed him as a necessary expense of liquidation and charged against the surplus due the German partners, or, at any rate, against the American assets, so that the parties would bear the expense ratably between them. As the bond was furnished to enable Mayer to obtain possession of the American assets for the purpose of liquidating and accounting for the same, and was an expense incurred for the benefit of all interested in the liquidation and settlement of the partnership, we think the premium should be allowed as a charge against the firm assets in his hands.

[3] It appears that during the years 1914, 1915, and 1916 the German government assessed against Mayer's partnership interest certain taxes, in all amounting to 266,432.40 marks. These taxes were paid by the German partner December 10, 1917, some 8 months after the outbreak of the war and the appropriation of Mayer's interest by the German partners. The District Court held that this sum might be deducted from the share of Mayer in the European assets. We, however, are of the opinion that this deduction should not have been made. Having appropriated Mayer's interest in those assets to themselves they cannot now claim that they paid the taxes for the purpose of protecting his interest and for his benefit. Whatever authority they may have had prior to the outbreak of the war had been terminated at the time the payments were made. It is plain that they did not act as trustees and for the protection of his interest, for that interest they had appropriated to themselves.

In the District Court the sum of 50,400 marks was also allowed to be deducted from Mayer's share in the European assets. It appears that all of this sum, except 600 marks, was paid by the German partners to Mayer's relatives after the declaration of war, on instructions received from Mayer prior to the outbreak of the war. Counsel for the Alien Property Custodian contends that the German partners were entitled to have these payments considered, even though the authority therefor was terminated by the outbreak of war, on the ground that they were made by them as trustees holding Mayer's interest. We, however, do not think that these payments, except the 600 marks paid before the outbreak of war, should have been allowed. Whatever au-

thority the German partners had received from Mayer prior to the war to make these payments was ended by the war, and, as we have pointed out above, on the outbreak of the war, the German partners appropriated Mayer's interest to themselves, so that they held no interest of his to protect.

We also think that Mayer's claim for counsel fees and other disbursements incurred in the prosecution of the suit of Mayer v. Garvan should be charged against the assets in Mayer's hands as liquidation expenses. In that suit he did not rest his claim to the possession of and the right to liquidate the American assets simply upon the dissolution agreement of February 7, 1917, but also upon his right to the possession of the property to secure his lien thereon and to account. On the latter issue he prevailed, and the reasonable expenses incurred were necessary liquidation expenses, and should also be charged against the assets in Mayer's hands.

The amount of such expenses will, of course, have to be determined on further hearing in the District Court.

[4] Judge Johnson has found that the German partners could not determine the distributive share of Mayer in the firm assets, and, if they had been able to do so, they could not pay any part of his share to him while a state of war continued between Germany and the United States. "They are not, therefore, liable for payment of interest upon his distributive share." Mayer urges that he was wrongfully deprived of his property, and should be left as well off as if that wrong had not been done him; that the Alien Property Custodian seized the property wrongfully, as that of the enemy partners; that he, an American citizen, ought to come out whole, as he had done nothing wrong; and that, thus, he should have his interest, or money in lieu of interest, on his distributive share. A majority of the court think the District Court was right in disallowing this claim for interest or compensation for the loss of use of his property.

The sum or sums set aside by the German partners as reserves to meet losses, and paid out by them after the outbreak of war, and during the years 1918, 1919, and 1920, when they were conducting the business on their own account, were properly disallowed as a liability.

We think the District Court acted with a proper sense of the equitable rights of the parties in making its decree with reference to the claim of Laible for interest, and its

order of the deposit of $7,000 with Mr. Mc-Clennen, as an officer of the court, under the terms imposed by the court. We think the District Court acted under the principles of equity in passing upon the question of the claim of the United States for the amount paid on account of the loss of cargo on the Carolyn. We do not see how any further order can now be made in this matter.

The decree of the District Court, as to the premium of $4,000, counsel fees and disbursements, taxes, and payments to relatives is modified as above pointed out, and, so modified, it is affirmed, with costs in this court to Mayer, to be satisfied in Nos. 1730 and 1731 from any surplus payable to the Custodian, and in No. 1732 by Reis et al.