**ST. PAUL FIRE & MARINE INS. CO.**
v.
**THE MOTOMAR et al.**
No. 167, Docket 22933.

United States Court of Appeals
Second Circuit.

Argued February 8, 1954.
Decided April 5, 1954.

Bigham, Englar, Jones & Houston, New York City, for libellant-appellant; F. Herbert Prem, New York City, and Sheldon A. Vogel, Brooklyn, N. Y., Advocates.

McNutt & Nash, New York City, for appellee; James E. Freehill, New York City, and Joseph H. Flynn, Bay Shore, N. Y., Advocates.

Before CHASE, Chief Judge, and L. HAND and MEDINA, Circuit Judges.

CHASE, Chief Judge.

The appellant is an American insurance company which insured two consignments of cargo that the appellee undertook to carry from New York to Bilbao, Spain, on its S.S. Motomar pursuant to the terms of bills of lading. A fire on the ship after it arrived at Bilbao having endangered it and its cargo, one of the consignments was jettisoned and the other was damaged by water in a successful attempt to put out the fire. The shipowner took cash deposits in Spanish money from the consignees of both of

these shipments as security for their general average contributions. It also exercised its right under the bills of lading to have the general average adjustment made at the port of discharge and appointed an adjuster who did that. The adjustment, which no one now questions, showed each of the consignees to be net creditors.

The appellant, as insurer, paid each of the consignees of the cargo for the loss sustained, reimbursed each for its general average deposit, and concededly became their subrogee. The credit balances shown by the general average adjustment are, and at all pertinent times have been, in a special deposit in the name of the appellee in a bank in Madrid, for payment on presentation of the "necessary documents of subrogation and the receipts given for the General Average deposits" to the holder thereof. The appellant is such a holder and was before this suit was brought. It would have been paid the credit balances in full in Spanish money in Spain upon presentation of such documents to the bank before suit and would now be so paid but has made no attempt thus to collect the amount of the credit balances. Had it done so, it would not have received free currency but instead money which it could not have transferred out of Spain unless it could first obtain the "necessary authorization of the relative competent bodies and the Instituto Espanol de Moneda Extranyera, subject to the laws of regulations to be set out by the Ministry of Commerce on the subject"; nor could it have lawfully used the payment to buy free currency without being authorized by the Instituto so to do.

Instead of seeking payment from the bank, it demanded payment from the general average adjuster to be made to it in New York. There was no compliance with this demand and it then brought this libel against the appellee shipowner, a Spanish corporation with a business office in the City of New York, and against the ship to recover, as subrogee of its insureds, the damages they sustained because of the fire. The ship was in the port of New York after the suit was brought and, to prevent its arrest, the appellee claimed it and appeared in the suit by its attorneys. Its underwriters gave attorneys for the appellant a letter in which they agreed "to pay any decree which may issue, after appeals, if any, * * * in respect of cargo carried under" the bills of lading covering the two shipments above mentioned, "without prejudice to any defenses available to the ship and the carrier." The answer to the libel relied, *inter alia*, upon § 4(2)(b) of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(2)(b), as a complete defense to the fire loss and, the parties having stipulated that the fire "was not caused by the design, actual fault, neglect, or privity of the claimant respondent," this defense was established and the sole issue tried was the right of the appellant to judgment for the amount of the credit balances on deposit in the Spanish bank. See, Du Pont De Nemours & Co. v. Vance, 19 How. 162, 173, 15 L.Ed. 584. It was held that the appellee was under no obligation to pay the credit balances to the appellant in the United States and the libel was dismissed on the merits.

The position of the appellant, simply stated, is that the court having jurisdiction; the appellee having admitted that the appellant was entitled to the payment of the credit balances a debt owed it by the appellee to the appellant having thus been shown, it was entitled to have judgment for the amount of the debt. Considerable pains have been taken to point out why the district court did have jurisdiction in this suit but we need not discuss that point at length since jurisdiction is both clear and undisputed. Indeed, the appellee appeared generally in the action. And were the appellant right in its insistence that the appellee did concede that it was indebted to it, or if the record otherwise showed that, it would also be right in its contention that judgment for the amount of the debt owed should have been entered in its favor, cf. Harris v. Balk, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023. But the acqui-

sition of jurisdiction by the court in no wise altered the obligation of the appellee in respect to the general average deposits. Die Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383.

There was a clause in the bill of lading covering each shipment which provided that, "General average shall be adjusted according to York-Antwerp Rules of 1924 and as to matters not therein provided for according to usage at port of adjustment, and shall be adjusted at the Port of New York or the last port of discharge at Carrier's option." Rule 23 of the York-Antwerp Rules deals with the disposition of such general average deposits as were here made and requires their payment into a special account in the names of two trustees, one nominated by the shipowner and the other by the depositors, in a bank approved by such trustees. They are there to be held in trust for payment to the parties shown entitled thereto by the general average adjustment. That was the obligation imposed upon the appellee by its receipt of the general average deposits. Its liability in this suit depends upon whether it has discharged that obligation by, at least, substantial compliance with the bill of lading provisions. Even though its general average obligations did not arise from any of the terms of the contract of carriage but instead came into being as a result of sacrifices made for the common benefit and its receipt of the general average deposits, each bill of lading by appropriate reference to the York-Antwerp Rules of 1924 makes those rules the yard-stick by which such obligations are to be measured. Consequently, had two trustees been nominated; the deposits been placed in a bank approved by them; and there held in trust for the benefit of those entitled thereto, all in compliance with the rules, the appellee's general average deposit obligations in respect to any credit balances would have been discharged. The obvious purpose of these rule provisions is to make sure that the general average deposits will be available for payment to those whose right to payment shall be established by the adjustment and, of course, to those, if any, who may thus be shown to have over-contributed and to have credit balances struck in their favor.

Since the appellant may take payment of the credit balances in exactly the same way and with exactly the same governmental restrictions upon its disposition of those payments that its subrogors could have taken them had the deposit in the bank been made in the names of two trustees in strict compliance with the rules in that respect, no damage to the appellant has been shown as a result of the bank deposit having been made in the name of the appellee. Nor has the selection of a depository bank, without approval by such trustees, been shown to have jeopardized the safety of the deposit. The bank has at all times been ready to pay the credit balances to whomsoever is entitled to them since the general average adjustment established their amount. Consequently, only if such trustees would not have approved any Spanish bank as the depository has there been any departure from the procedure provided by the York-Antwerp Rules which has harmed the appellant. The record is silent as to whether such trustees would have approved a Spanish bank but as the deposits were received in Spanish money in Spain and the adjustment was to be made in that country it is inferable, in the absence of any proof to the contrary, that some bank in Spain would have been the approved depository, and that the balances would have been payable in pesetas in Spain just as they are now. Having made them so available for payment the appellee has substantially complied with its general average obligations. That being so, no debt owing to the appellant has been shown which could be the basis of a judgment against it in this suit. Zimmermann v. Sutherland, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034; Perutz v. Bohemian Discount Bank, 304 N.Y. 533, 110 N.E.2d 6. We do not stop to consider whether the credit

balances are held in the bank in trust. Whether they are or not is immaterial under the circumstances here shown.

To the extent which Sun Insurance Office, Ltd. v. Arauca Fund, D.C.S.D.Fla., 84 F.Supp. 516 and Royal Ins. Co. v. Compania Transatlantica Espanola, D.C. E.D.N.Y., 57 F.2d 288, may be in conflict we are unable to agree with them.

Judgment affirmed.